UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EVAN EVANGELOU, | : |
| Plaintiff, | : Civil Action No.: 11-cv-531 (RC) |
| v. | : Re Document No.: 34 |
| DISTRICT OF COLUMBIA, *et al.*, | : |
| Defendants. | : |

**MEMORANDUM OPINION**

GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**I. INTRODUCTION**

Plaintiff, Evan Evangelou, worked as a probationary police officer with the Metropolitan Police Department ("MPD") from September 2007 to March 2010. During this probationary period, Plaintiff was accused of attempting to extort individuals at a local establishment. Plaintiff was terminated following an MPD internal investigation, which concluded that Plaintiff had engaged in misconduct. This termination occurred during Plaintiff's probationary period. Plaintiff has now brought suit pursuant to 42 U.S.C. § 1983 on two counts: 1) termination in violation of 42 U.S.C. § 1983 for exercising his constitutional right against self-incrimination; and 2) denial of due process in violation of 42 U.S.C. § 1983 for defamatory conduct implicating a liberty interest under the Due Process Clause of the Constitution. Defendants, the District of Columbia and its Chief of Police Cathy Lanier, move for summary judgment on both counts.

**II. FACTUAL BACKGROUND**

Plaintiff, Evan Evangelou, was hired as a probationary police officer with the MPD on September 29, 2008. Am. Compl. ¶ 5, ECF No. 10. Plaintiff's position was probationary for an

eighteen-month period, which was set to expire on March 29, 2010. *Id.* During this probationary period, Plaintiff visited a bar called "My Brother's Place." Evangelou Dep. Ex.1, at 42:18–43:4, 49:12–18, Dec. 11, 2013, ECF No. 34. On Plaintiff's first visit to the establishment, in November 2009, he allegedly witnessed a woman selling PCP in the bar's bathroom. *Id.* at 43:9–22. Plaintiff asserts that he brought this to the attention of a bouncer and then left the premises, as he was off duty and could not take any official action. *Id.* Plaintiff visited this establishment again on December 6, 2009. Following this visit, the manager and bouncers at the bar lodged a complaint with MPD, stating that Plaintiff attempted to extort individuals at the establishment. *Id.* at 49:21–51:18. Specifically, they stated that the Plaintiff attempted to coerce them into hiring the Plaintiff and two "deputies" to take care of security problems at the bar, and offered to handle a pending police investigation into the business for allowing underage drinking. Robinson Mem. Ex. 2, at 1, ECF No. 34.

As a result of this allegation, the MPD relocated Plaintiff to a desk job and began an internal investigation of the incident. Am. Compl. ¶¶ 7–8. An investigator from the MPD's Internal Affairs Division contacted Plaintiff in order to interview him. *Id.* ¶ 8. However, Plaintiff, after counsel from his attorney, invoked his Fifth Amendment right against self-incrimination, and refused to answer any questions or make any statement with regard to this investigation. *Id.*; Evangelou Dep. 58:6–59:18. At the conclusion of the investigation, MPD found that Plaintiff had "engaged in misconduct that will additionally be presented to the USAO for criminal review." Robinson Mem. Ex. 2, at 5. On this basis, Agent Robinson "recommended that Officer Evangelou's employment with [MPD] . . . be terminated." *Id.* Thereafter, the Director of Human Resource Management Division sent a memorandum to Chief Cathy Lanier, recommending that

2

Plaintiff be terminated based on the misconduct. Human Resources Mem. Ex. 3, ECF No. 34. Chief Lanier terminated Plaintiff effective March 19, 2010. Lanier Letter Ex. 4, ECF No. 34.

Since his termination, Plaintiff has only applied to two police officer positions in New York and New Jersey. Evangelou Dep. 14:13–15:3. After passing the written exam for the New York Police Department, Plaintiff was asked to complete paperwork with the Department's "investigators." *Id.* at 16:5–21, 22:1–20. The record does not clearly indicate whether Plaintiff was denied this job, and if so, for what reasons. Plaintiff similarly passed the written exam for the New Jersey Police Department, but admits that he did not further pursue this opportunity after the Department asked him for documentation relating to previous employment. *Id.* at 15:4–16:3. Plaintiff has not applied to any other police departments, although he has browsed several departments' websites. *Id.* at 14:13–22.

Plaintiff has brought suit pursuant to 42 U.S.C. § 1983 on two counts: 1) termination in violation of 42 U.S.C. § 1983 for exercising his constitutional right against self-incrimination; and 2) denial of due process in violation of 42 U.S.C. § 1983 for defamatory conduct implicating a liberty interest under the Due Process Clause of the Constitution. Defendants move for summary judgment on both counts.

### III. LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

### A.  Count I: Alleged Violation of Constitutional Right Against Self-Incrimination

Plaintiff first asserts that Chief of Police Cathy Lanier terminated Plaintiff because he refused to make a statement to the investigating officer without the protections set forth in *Garrity v. New Jersey*, 385 U.S. 493 (1967), and instead asserted his Fifth Amendment right against self-incrimination. Am. Comp. ¶ 13. But Plaintiff's claim fails because he fails to present any evidence, or even make any arguments, that he was terminated because he exercised his Fifth Amendment right against self-incrimination.

"Like other individuals, government employees enjoy the protection of the privilege against self-incrimination. Yet the government, like private employers, needs to ensure that its employees are faithfully performing their duties. The government therefore may fire employees

who refuse, on the basis of their Fifth Amendment privilege, to answer questions concerning the performance of their duties, so long as the employees' answers could not be used against them in a criminal prosecution." *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 291 (D.C. Cir. 1993) (citing *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280, 284–85 (1968); *Gardner v. Broderick*, 392 U.S. 273, 278–79 (1968); *Garrity*, 385 U.S. at 49); *accord Chavez v. Martinez*, 538 U.S. 760, 768 (2003) (citing *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977); *Lefkowitz v. Turley*, 414 U.S. 70, 84–85 (1973)) (noting that "governments may penalize public employees and government contractors (with the loss of their jobs or government contracts) to induce them to respond to inquiries, so long as the answers elicited (and their fruits) are immunized from use in any criminal case against the speaker").

Public employees and government contractors cannot, however, constitutionally be given the "Hobson's choice between self-incrimination and forfeiting [their] means of livelihood." *Gardner*, 392 U.S. at 277. "[T]he state must," therefore, "decide whether to demand a statement from an employee [or contractor] on job-related matters, in which case it may not use the statement in a criminal prosecution." *United States v. Vangates*, 287 F.3d 1315, 1321 (11th Cir. 2002). What the government cannot do is both demand a potentially self-incriminating statement and reserve the right to use that statement in a later criminal proceeding. *See Atwell v. Lisle Park Dist.*, 286 F.3d 987, 990 (7th Cir. 2002) (Posner, J.) ("The government is not allowed to force a person to make a statement, even out of court, that might be used as evidence that he had committed a crime."); *Gulden v. McCorkle*, 680 F.2d 1070, 1074 (5th Cir. 1982) (observing that "it is the compelled answer in combination with the compelled waiver of immunity that creates the Hobson's choice for the employee").

In conducting an investigation into the potentially criminal conduct of a public employee, "the government may *either* demand a self-incriminating statement *or* withhold immunity for the use of the statement in a criminal proceeding—but not both." *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 166 (D.D.C. 2012). Here, the investigator did not demand a statement from the Plaintiff, and informed him that anything he said could be used against him in a criminal prosecution. Am. Compl. ¶ 8. Because Plaintiff did not have immunity for any statements he made, the government could not also punish him for refusing to provide potentially self-incriminating information. *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 291–92 (D.C. Cir. 1993); *see also Aguilera v. Baca*, 510 F.3d 1161, 1172 n.5 (9th Cir. 2007) ("If [the police officers being investigated were] not under compulsion [to answer questions], . . . then they had the constitutional right to remain silent without fear of punishment.").

Plaintiff alleges just that—that Chief Lanier terminated him precisely because he refused to give a statement to the investigating officer, and instead chose to exercise his Fifth Amendment right against self-incrimination. Am. Compl. ¶ 13. However, Plaintiff does not substantiate this assertion with a single piece of evidence. Indeed, there is no indication that Chief Lanier even knew that Plaintiff had asserted his right against self-incrimination. Defs.' Mot. Summ. J. 6–7. Instead, the record indicates that Chief Lanier made her decision based on the internal investigation report, which concluded by finding that Plaintiff had "engaged in misconduct that will additionally be presented to the USAO for criminal review," and recommended that he be terminated. Robinson Mem. Ex. 2, at 5. The report does not state that Plaintiff asserted his right against self-incrimination.[1] Defs.' Mot. Summ. J. 6–7.

---

[1] The report does state that Evangelou "did not provide a statement." Robinson Mem. Ex. 2, at 2. But Plaintiff does not argue that this simple statement equates with asserting a Fifth Amendment right, or that Chief Lanier was aware of this fact.

Plaintiff simply does not respond to the Defendants' argument in his brief in opposition. Accordingly, because there is no evidence that Chief Lanier terminated Plaintiff for exercising his right to remain silent, or that she even knew that he had asserted this right, the Court grants the Defendants' motion for summary judgment as to Count 1.

**B. Count II: Alleged Deprivation of a Liberty Interest Without Due Process**

Plaintiff next argues that, as a result of his termination, he "has been wrongly and unjustifiably stigmatized as being both unsuitable and unqualified for employment as a police officer," thus depriving him of a protected liberty interest in violation of the Due Process Clause. Am. Compl. ¶ 26. In support of his sole argument with respect to this allegation, Plaintiff points to a D.C. regulation, which provides in relevant part that "an agency shall terminate an employee during the probationary period whenever his or her work performance or conduct fails to demonstrate his or her suitability and qualifications for continued employment." D.C. Mun. Regs. tit. 6-B, § 814.1. Plaintiff argues that, viewed in light of this regulation, the mere fact that he was terminated while still on a probationary period is, by its very nature, defamatory. Pl.'s Opp'n to Defs.' Mot. Summ. J. ¶ 4, ECF No. 36. But Plaintiff's reading of this regulation is overbroad and, because he cannot rely on it to turn an otherwise silent termination into a due process violation, his "reputation-plus" claim fails. Moreover, because Plaintiff cannot establish that his termination precluded him from pursuing his chosen career, his "stigma or disability" claim fails as well.

Under the precedents of the Supreme Court and the D.C. Circuit, a government employee's due process rights are implicated when a firing or demotion is coupled with a defamatory official statement, *see Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983), or when an adverse employment action (considered somewhat more broadly) is combined with "a

7

stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities," *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)). The first type of claim is known as a "reputation-plus" claim—"it presumably rests on the fact that official criticism will carry much more weight if the person criticized is at the same time demoted or fired." *Id.*; *see also Paul v. Davis*, 424 U.S. 693, 709 (1976) (reading *Roth* to hold that "defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation," but not to suggest that "a defamation perpetrated by a government official but unconnected with any refusal to rehire would be actionable" as a due process violation). The second type of claim is known as a "stigma or disability" claim, because "it does not depend on official speech, but on a continuing stigma or disability arising from official action." *O'Donnell*, 148 F.3d at 1140. The Court addresses each type of claim in turn.

**1. <u>The Plaintiff's Reputation-Plus Claim</u>**

Plaintiff first alleges a "reputation-plus" claim, arguing that his termination was accompanied by official defamation (i.e., termination during the probationary period). "Such a claim requires some official action because government defamation alone is insufficient to create a liberty interest under the Due Process Clause." *Dave v. D.C. Metro. Police Dep't*, 926 F. Supp. 2d 247, 250 (D.D.C. 2013) (internal quotation marks omitted) (quoting *Aguirre v. SEC*, 671 F. Supp. 2d 113, 119 (D.D.C. 2009) (quoting *Orange v. District of Columbia*, 59 F.3d 1267, 1274 (D.C. Cir. 1995))). However, in order to maintain a reputation-plus claim, a plaintiff must also "demonstrate that the stigmatizing reasons for h[is] discharge were disclosed to the public or were made available to prospective employers or other government personnel." *Doe v. U.S. Dep't of Justice*, 753 F. 2d 1092, 1113 (D.C. Cir. 1985); *see also Dave*, 926 F. Supp. 2d at 250

("[N]early all of the courts in this Circuit to have considered the issue, have held that, in order for plaintiff to posses [sic] a liberty interest, the government must have publicly disclosed the defamatory information."); *McCormick v. District of Columbia*, 899 F. Supp. 2d 59, 66 (D.D.C. 2012) ("Every case of which the Court is aware has presumed that 'public disclosure' requires exactly that: The Government must make *public* a stigmatizing allegation."); *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 110 (D.D.C. 2012) (dismissing the plaintiff's "reputation-plus" claim because the government never spread derogatory information about the plaintiff to any third party).

Plaintiff does not point to a single piece of evidence demonstrating that the Defendants publicly disclosed any defamatory statements, or that such information was made available to prospective employers. There is no evidence that the Defendants specifically contacted the Plaintiff's potential employers. Nor is there evidence that the MPD released the reason for Plaintiff's termination or the results of its internal investigation to the public. Indeed, Defendants assert that official personnel files, such as the Plaintiff's employment file, "are considered protected personnel records and are not subject to open inspection or review by any third party." Walton Decl. Ex. 5, at ¶¶ 6–7, ECF No. 34. A third party may view Plaintiff's file only if the third party presents a signed authorization of release by the employee. *Id.* This is a fatal flaw to Plaintiff's "reputation-plus" claim because, obviously, the alleged defamatory statements cannot harm the Plaintiff's reputation or his employment prospects if employers have no knowledge of the statements. *See McCormick*, 899 F. Supp. 2d at 66 (D.D.C. 2012) ("Every case of which the Court is aware has presumed that 'public disclosure' requires exactly that: The Government must make *public* a stigmatizing allegation.").

Instead, Plaintiff argues that due to title 6-B, section 814.1 of the D.C. Municipal Regulations, "[t]ermination . . . during his probationary period carries with it the clear and unambiguous stigma that the plaintiff is both unsuited and unqualified to be a police officer." Pl.'s Opp'n. ¶ 6. Plaintiff explains that because the regulation and the probation period both exist simply to determine the suitability of individuals as permanent police officers, his termination during the probationary period sends the clear signal that the individual is unsuited for an officer position. *Id.* ¶ 7. In essence, Plaintiff argues that his termination during the probationary period, in conjunction with section 814.1, is equivalent to the public disclosure of defamatory statements.

But Plaintiff's logic is flawed and misconstrues section 814.1. Although the regulation requires agencies to terminate probationary employees who are unsuited for a permanent position, it does not specify that probationary employees may be terminated *only* for poor performance. *See, e.g.*, *Piroglu v. Coleman*, 25 F.3d 1098, 1104 (D.C. Cir. 1994) (interpreting a structurally similar regulation and finding that the regulation "merely sets out certain circumstances in which a probationary employee may be terminated" rather than "limit[ing] the District's discretionary right to otherwise terminate him"); *Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 171 n.5 (D.D.C. 2012) (finding *Piroglu*'s logic to "suggest that the mere fact of Mr. Evangelou's firing does not imply an official determination that 'his . . . work performance or conduct fail[ed] to demonstrate his . . . suitability and qualifications for continued employment'"). As the Defendants assert, there are numerous reasons aside from unsuitability for which an employee may be terminated during his probationary period: budget concerns, personality conflicts, a change in the needs of the department, or a host of other reasons. Accordingly, this Court cannot conclude that Plaintiff's termination resulted in

reputational damage simply due to the existence of section 814.1. Because Plaintiff is unable to meet a necessary element of a "reputation-plus" claim, the Court finds that it is unable to survive summary judgment.

## 2. **Plaintiff's Stigma or Disability Claim**

Plaintiff also asserts a "stigma or disability" claim, but relies upon the same argument previously discussed in his "reputation-plus" claim. Specifically, Plaintiff argues that section 814.1 sends a signal to other law enforcement agencies that individuals who are terminated during their probationary period were terminated because they are unfit for service. It is for this reason that Plaintiff asserts he was unable to find other work in law enforcement. As already noted, however, termination pursuant to section 814.1 is not the only reason for which an officer may be terminated during the probationary period. Officers can be terminated due to budgetary constraints, change in departmental needs, personality conflicts, etc. Nor does Plaintiff show why other law enforcement departments would automatically assume, without more, that Plaintiff's termination during the probationary period was due to his unsuitability as an officer. Accordingly, Plaintiff cannot prove that he was stigmatized from an official action by simply pointing to section 814.1's existence.

Moreover, Plaintiff cannot show that he was actually excluded from employment opportunities as a result of his termination. In order to establish a "stigma or disability" claim, a plaintiff must show that a government action had "the *broad* effect of largely precluding [him] from pursuing [his] chosen career." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994). This can occur through an informal action that has the practical effect of precluding an individual from the career. *Id.* at 1528–29. However, the action must "seriously affect, if not destroy plaintiff's ability to seek employment in his field or substantially reduce the value of his

human capital." *Aguirre v. SEC*, 671 F. Supp. 2d at 119 (internal quotation marks omitted). Plaintiff has not made such a showing here. It is undisputed that Plaintiff has only applied to two police departments since his termination—New York and New Jersey. Evangelou Dep. 14:13–15:3. Although he browsed the website of a few other Departments, Plaintiff admits that he never sent out other applications. *Id.*

Plaintiff asserts that he was rejected from the New York Police Department after disclosing that he had previously been terminated during his probationary period. Pl.'s Opp'n. ¶ 7. Although this provides some circumstantial evidence of the preclusive effects of his termination, a single rejection alone is insufficient to establish that the Plaintiff's ability to seek employment was seriously affected or destroyed. *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995) (holding that the "government action precluding a litigant from future employment opportunities will infringe upon his constitutionally protected liberty interests only when that preclusion is either sufficiently formal or *sufficiently broad*") (emphasis added). And Plaintiff has not, and cannot, establish a pattern of rejection. After all, Plaintiff voluntarily withdrew his application from the New Jersey Police Department after he was asked to provide information regarding previous employment history. Evangelou Dep. 15:4–16:3. And Plaintiff failed to apply to other police departments. *Id.* at 15:1–3. Plaintiff's failure to seek employment opportunities precludes him from proving that his termination foreclosed opportunities for future employment in the law enforcement field.[2] *See Orange v. District of Columbia*, 59 F.3d 1267, 1275 (D.C. Cir. 1995) (holding that the plaintiffs "failed to demonstrate that the allegedly false

---

[2] The parties do not define the "law enforcement" field or discuss whether this is the correct career category to assess Plaintiff's preclusion claim. The parties appear to assume that preclusion from a job as a police officer equated with the "law enforcement" field. Although the Court believes this definition may be too narrow (e.g., a showing that Plaintiff was precluded from police officer positions may be insufficient to show that he was precluded from his chosen career), the Court need not decide the matter.

statements . . . foreclosed their opportunities for future government employment" because neither "sought a position in the government" after their dismissals). Accordingly, a reasonable jury could not find that the Defendants stigmatized Plaintiff in violation of his Due Process rights, and so Plaintiff's "stigma or disability" claim must also fail.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** as to all counts. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: August 11, 2014 					RUDOLPH CONTRERAS
												United States District Judge